# Exhibit 1

# BR⬤WN RAYSMAN

**BROWN RAYSMAN MILLSTEIN FELDER & STEINER** LLP

Patricia LeGoff
Associate
(212) 895-2354
plegoff@brownraysman.com

June 30, 2006

VIA FACSIMILE 617-565-3196
AND REGULAR MAIL

Rene Sanchez, Investigator
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center
Room 475
Boston, MA 02203-0506

        Re:    *Curns v. Wal-Mart*
              Charge No.:  165-2005-01514

Dear Mr. Sanchez:

      As counsel to Respondent Wal-Mart ("Wal-Mart"),[1] we submit this Statement of Position and the annexed exhibits in response to the Charge of Discrimination filed by Complainant, Kathleen Curns ("Complainant").  Complainant erroneously alleges that Wal-Mart discriminated against her on the basis of her gender (female), age (61) and alleged disability (not identified) in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Americans with Disabilities Act ("ADA").[2]

---

[1] The Complainant improperly identifies "Wal-Mart" as the only respondent in this matter.  The appropriate respondent in this matter is Wal-Mart Stores East, L.P., which is the operating entity for Store #2262 in Oneonta, NY.  Wal-Mart respectfully requests that the pleadings be amended to reflect the appropriate respondent.

[2] Please note that this response includes confidential information not to be disclosed without the written approval of Wal-Mart Stores, Inc.  *See*, 42 U.S.C. §§ 2000e-5(b); 2000e-8(e); 29 C.F.R. §§1601.22, 1601.26; 56 Fed. Reg. 10847.  In addition, this response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the EEOC in its investigation and facilitating the informal resolution of these matters.  This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the

---

D00002277

Rene Sanchez
June 30, 2006
Page 2

## A.    The Company

Wal-Mart is dedicated to providing quality items for retail sale to consumers and to making significant contributions to the communities it serves.  Wal-Mart conducts business operations throughout the United States, including the operation of stores in many communities throughout the State of New York.  As Wal-Mart strongly desires to be a positive model of corporate practices in the communities in which it does business, it is sensitive to the rights of its associates and endeavors to protect those rights to the fullest extent possible.

## B.    Wal-Mart's Anti-Discrimination Policy

Wal-Mart explicitly prohibits discrimination.  Wal-Mart's Policy provides, in pertinent part:

> Wal-Mart is committed to ensuring that our Associates represent the diversity of our Customers/Members and the communities we serve.  Wal-Mart will not tolerate discrimination in employment on the basis of race, color, age, sex, sexual orientation, religion, disability, ethnicity, national origin, veteran status, marital status or any other legally-protected status.  Any such discrimination against a Customer/Member or Supplier is also strictly prohibited.
>
> We do not tolerate discrimination of any kind.   Not only is discrimination against our beliefs, but it's also against the law.

*See* Associate Guide, p. 10, attached as Exhibit A.

## C.    Complainant's Employment History With Wal-Mart

Wal-Mart Store #2135 in Cobleskill, New York hired Complainant on or about July 12, 1995.  During her employment with Wal-Mart, Complainant worked in a variety of positions, including Assistant Manager (for approximately six months in 1997).  In September, 1997, Complainant became a District Manager of Wal-Mart's Shoes and Jewelry Division.  District

---

Wal-Mart's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Complainant's allegations.  Because additional facts likely would be uncovered through discovery or following a full investigation, Wal-Mart in no way waives its right to present new or additional information at a later date, for substance or clarification.  Moreover, by responding to this charge, Wal-Mart does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the charge and Complainant's allegations.

Rene Sanchez
June 30, 2006
Page 3

Managers of Shoes and Jewelry had responsibility for certain aspects of the jewelry and shoe departments in Wal-Mart Stores within a particular Wal-Mart geographic district. Among other things, they were charged with the responsibility of maximizing the sales and profits of those departments. Complainant held this position until May, 2005, when it was eliminated by Wal-Mart as part of a reorganization. As a result of the reorganization, the associates who held the position of District Manager of Shoes and Jewelry, including Complainant, had to look for new employment opportunities.

1.      Overview of Wal-Mart's Relevant Management Structure

Individual Wal-Mart Stores are run by a Store Manager, who has overall responsibility for the entire Store, including responsibility for all matters relating to personnel and financial issues.   Among other things, Store Managers must have overall knowledge of general merchandising, knowledge of customer flow and shopping patterns, and be able to forecast and develop sales budgets for the entire Store.

Co-Managers report directly to the Store Manager.  Co-Managers are expected to have overall knowledge of the Store's operations and be able to run and operate the Store in the absence of the Store Manager.[3]   The next level of management below the Co-Manager is the Assistant Manager.  An Assistant Manager, among other things, has more direct supervisory responsibilities over hourly associates and is expected to motivate and manage associates.  An Assistant Manager, unlike a Co-Manager and a Store Manager, is charged with the responsibility of overseeing a Department or Departments within the Store, rather than overseeing the operations of the Store as a whole.

Store Managers report to a District Manager, who has overall responsibility for all Wal-Mart Stores within a specific Wal-Mart geographic district.  Complainant, as a District Manager for Shoes and Jewelry, was the District Manager for a "specialty division," with responsibility only for her specific department within each Store in the District.  The District Manager of a specialty division reports to a Regional Manager of the specialty division, and has significantly less responsibility than a District Manager.  Indeed, the District Manager of a specialty division has responsibility that is significantly more limited than that of Store Managers, Co-Managers or even Assistant Managers, because their range of responsibility is focused on *sales* in a specific Department.  The overall *management* of the Department is the responsibility of the Assistant Manager.

---

[3] There may be instances where the needs of the particular Store require a Co-Manager to be more specialized in a specific area of the Store.

D00002279

Rene Sanchez
June 30, 2006
Page 4


2.    Complainant Applies for Fashion Merchandiser Positions

In May, 2005, as part of its reorganization, Wal-Mart created the position of District Fashion Merchandiser. The Fashion Merchandiser position encompassed a much wider range of duties and responsibilities than the position of District Manager of Shoes and Jewelry. For instance, unlike Shoes and Jewelry District Managers, who were responsible for certain tasks in only two Departments, Fashion Merchandisers have overall responsibility for evaluating sales and profit trends, managing overall inventory and shrink and implementing merchandising setup, displays and features for apparel generally. In addition, Fashion Merchandisers must have knowledge of merchandising and cross-merchandising procedures, including choosing displays for the apparel, and setting up and directing the set-up of the displays. Among other things, the Fashion Merchandisers work with and assist the managers of the Store in promoting apparel merchandise and planning the Apparel Departments based on the season and the needs of customer. There are far fewer District Fashion Merchandiser positions than District Managers of Shoes and Jewelry positions.

Although Complainant applied for a number of District Fashion Merchandiser positions, Wal-Mart viewed other applicants as being better qualified for those positions.[1]  One District Fashion Merchandiser position that Complainant applied for was in Cortlandville, New York. Wal-Mart interviewed Complainant for the position along with other candidates, but offered the position to Kathy Schubert, who also had been a District Manager for Shoes and Jewelry. District Manager, David Eaton, recommended Ms. Schubert for the Fashion Merchandiser position because, among other things, it was his view that Ms. Schubert interviewed better than Complainant and because he viewed Ms. Schubert as having experience running a more difficult District. In addition, Ms. Schubert's management skills and hard work had been recognized when she was twice named District Manager of the Year for her district.

Complainant also applied for a District Fashion Merchandiser position in Johnston, New York. For a number of reasons, Complainant was not viewed as the best candidate for this position, which was offered to Sabrena Hendricks. Ms. Hendricks had been an Assistant Manager for more than one year and had worked as a Co-Manager for approximately one year prior to applying for the District Fashion Merchandiser position. As a result, Ms. Hendricks had broader in-store managerial experience and therefore a broader and deeper knowledge of all of the Store's merchandise and apparel. This knowledge was helpful for the District Fashion Merchandiser position, as the position required working with numerous Store Departments and having more overall apparel experience. In contrast, Complainant's experience was more limited. She had minimal experience as an Assistant Manager, and no Co-Manager experience.

---

[1]  We note that the process for choosing candidates for each position was independent; that is, the Wal-Mart managers making hiring recommendations were not necessarily the same for each position, and Complainant's performance in applying for one position did not necessarily impact her ability to get another position.

D00002280

Rene Sanchez
June 30, 2006
Page 5

Complainant also applied for a District Fashion Merchandiser position in East Greenbush, New York. District Manager, Stacey Wiggins, knew Complainant because she had worked in the same District with Ms. Wiggins. Ms. Wiggins did not recommend Complainant for the position because she did not believe that Complainant was the best candidate for the position. Ms. Wiggins recommended another Shoes and Jewelry District Manager, John Morgans, for the position. Ms. Wiggins viewed Mr. Morgans as the best candidate of the approximately nine candidates who applied. With respect to Complainant, among other things, Ms. Wiggins was of the opinion that Mr. Morgans performed better during his interview, including by demonstrating a better knowledge of Wal-Mart's policies and procedures. Also, Ms. Wiggins had worked with Complainant and had concerns about, among other things, Complainant's managerial abilities. For example, Ms, Wiggins was of the view that Complainant could have been a more effective manager if she had done more to avoid engaging in personal friendships with subordinates. Among other responsibilities, the District Fashion Merchandiser serves as a liaison between Home Office and Wal-Mart associates (including managers) in Wal-Mart Stores with respect to his or her area of responsibility. Ms. Wiggins believed that Mr. Morgans would be more effective than Complainant in that task. In order to be effective Shoes and Jewelry District Managers, these associates had to maintain and develop relationships with the relevant in-store Managers. Ms. Wiggins believed that Complainant could have done this better when she was a Shoes and Jewelry District Manager. Indeed, even Complainant understood that her qualifications fell short for a District Fashion Merchandiser position, as she advised Ms. Wiggins that her lack of apparel experience could interfere with her ability to get one of the positions.

3.    Complainant Applies for a Store Manager Position

In May, 2005, Complainant applied for a Store Manager position. Wal-Mart did not view her as the best candidate for the job because, among other things, she did not have as much in-store managerial experience as the candidate chosen for the position. Complainant had only worked as an Assistant Manager for a few months, and had no Co-Manager experience. By contrast, Co-Manager, Loren Dewey, who was hired to fill the position, had worked as an Assistant Manager for six years and then as a Co-Manager for nearly three years before applying for the Store Manager position.

4.    Complainant Accepts an Assistant Manager Position and Continues Applying for Other Positions

At the end of June, 2005, Complainant spoke with then Regional Personnel Manager, Micah Hawk, regarding her efforts to find another position within Wal-Mart. Mr. Hawk advised Complainant that there was an available position for her as an Assistant Manager in the Oneonta,

Rene Sanchez
June 30, 2006
Page 6

New York, Wal-Mart, and that she could take that position and continue to apply for other jobs, if she wished. Complainant accepted the Assistant Manager position, and continued to apply for Co-Manager positions. Specifically, Complainant timely applied for two Co-Manager positions.[5]

As to the first Co-Manager position, David Eaton, District Manager, recommended Assistant Manager, Daniel Houde for the position. Mr. Houde had more experience than Complainant as an in-store manager, as he had been working as an Assistant Manager for approximately six years at the time he applied for the Co-Manager position. Unlike Complainant, Mr. Houde, was involved with the day-to-day operations of the Store, including profit and loss information and personnel issues. In addition, Mr. Eaton felt that Mr. Houde interviewed better than Complainant. Among other things, Mr. Eaton felt that Mr. Houde was more confident in his answers and was more knowledgeable about the Store's operations, including year-to-date profits. In Mr. Eaton's opinion, Complainant needed to spend more time working in a Store as an Assistant Manager in order to better qualify for a Co-Manager position.

The second Co-Manager position Complainant applied for was a position in Oneonta, New York. Mr. Eaton recommended that this position be offered to Assistant Manager, Brian Woodward. In Mr. Eaton's opinion, Mr. Woodward was better qualified than Complainant, in part because Mr. Woodward had been an Assistant Manager for three years prior to applying for the Co-Manager position. Again, in Mr. Eaton opinion, Complainant needed more experience in a Store as an Assistant Manager and learning about the day-to-day operations of a Store in order to better qualify for the Co-Manager position.[6]

Complainant is currently employed as an Assistant Manager in Oneonta and is earning the same base salary she was earning as a District Manager of Shoes and Jewelry.[7]

## D.    Complainant's Allegations and Wal-Mart's Response

Complainant erroneously alleges that she did not get the positions referenced above because of discrimination based on her alleged unidentified disability, her age (61) and her

---

[5]  Complainant also sought a Co-Manager position in Cobleskill, New York, but did not timely apply for the position. Vacant positions are posted on the Wal-Mart computer system for three days and applicants generally needs to apply within the three-day posting period in order to be considered for the position.

[6]  Wal-Mart has had numerous Co-Manager positions available since Complainant last applied for such a position. Complainant has not applied for any of them.

[7]  Complainant's base salary remained the same. Her cost of living adjustment changed, however, because her work location changed. The cost of living adjustment is based, in part, on where an associate works.

Rene Sanchez
June 30, 2006
Page 7

gender (female). In fact, Wal-Mart had bona fide business reasons for not offering her these positions. As discussed above, Wal-Mart believed that other candidates were better qualified for the positions Complainant sought. Other than the fact that she did not get the positions for which she applied, Complainant offers absolutely no evidence to support her claim of discrimination.

1.   Complainant Has Not Suffered Any Adverse Employment Action and Her Charge Should Be Dismissed

Among other things, to establish a *prima facie* case of discrimination based on her gender, age or alleged disability, Complainant must prove that she suffered an adverse employment action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fisher v. Vassar College*, 114 F.3d 1332, 1344 (2d Cir. 1997).

Here, Complainant worked as a District Manager of Shoes and Jewelry until Wal-Mart eliminated the position in May, 2005.[8] In July, 2005, Complainant accepted a position as an Assistant Manager in Oneonta, New York, where she is currently employed. Therefore, Complainant cannot establish, *inter alia*, that she suffered an adverse employment action or that any adverse employment action occurred under circumstances giving rise to an inference of discrimination.

As summarized by the Second Circuit, an adverse action by an employer "is a 'materially adverse change in the terms and conditions of employment.'" *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 85, *quoting Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). Sufficiently serious actions that might meet this standard include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* It must "affect[] employment in a way that is both detrimental and substantial." *Weeks*, 273 F.3d. at 87. As to the allegation that the plaintiff in *Weeks* had been forced to relocate to another office, the Court opined that no matter how unpleasant, the move had no "tangible adverse effect . . . on the terms and conditions of [plaintiff's] employment." *Id.* at 87.

In this case, Complainant earns the same salary as an Assistant Manager as she earned as a District Manager of Shoes and Jewelry. Aside from Complainant's claim that her salary was reduced, which is not true, there is no suggestion that the terms and conditions of Complainant's employment changed materially. For this reason alone her charge should be dismissed.

---

[8] Complainant does not allege that the elimination of the position was an act of discrimination.

Rene Sanchez
June 30, 2006
Page 8

    2.    <u>Even If Complainant Were Viewed As Having Suffered An Adverse Employment Action, Which She Has Not, She Cannot Show That The Decisions Not To Offer Her The Positions That She Sought Were Affected By Discriminatory Animus.</u>

Complainant contends, without factual support, that Wal-Mart discriminated against her on the basis of her age, gender and unidentified disability by not offering to her any of the positions she sought. Complainant's claims are without merit. As explained above, based on the judgment of the managers involved in the interviewing processes and the information available to them, Wal-Mart did not view Complainant as the most qualified applicant. Complainant has not offered any evidence that her gender, age or unidentified disability played a role in the decision not to hire Complainant for any position for which she applied.

With respect to her claims for age and gender discrimination, to establish a *prima facie* case, Complainant must show that: 1) she is a member of the protected class; 2) she applied and was qualified for a job for which Wal-Mart was seeking applicants; 3) she was rejected for the position; and 4) the circumstances give rise to an inference of discrimination. *Centeno v. NYC*, 2005 U.S. Dist. LEXIS 41895, *11 (E.D.N.Y. May 12, 2005), *aff'd*, 164 Fed. Appx. 167 (2d Cir. 2006). With respect to her claim of disability discrimination, Complainant must also show that: 1) she suffers from a disability within the meaning of the ADA; and 2) Respondent had notice of her disability. *See James v. Trustees of Columbia Univ.*, 2003 U.S. Dist. LEXIS 23167 (S.D.N.Y., Dec. 22, 2003).

Complainant cannot establish her *prima facie* case because, among other things, she has no evidence that discriminatory animus played any role in Wal-Mart's decisions. Rather, as we have shown, in Wal-Mart's opinion Complainant was not the most qualified applicant for any of the positions she sought.

Further, with respect to the gender claim, two of the Fashion Merchandiser positions that Complainant applied for went to female applicants, Ms. Schubert and Ms. Hendricks. These facts dispel any possible inference of gender discrimination. *See McCalman v. Partners In Care*, 2003 U.S. Dist. LEXIS 17211, *21 (S.D.N.Y. Sept. 30, 2003) (inference of discrimination belied by the fact that one of the individuals promoted to the position sought by plaintiff is in the same protected class as plaintiff).

As to the third Fashion Merchandiser position Complainant applied for, District Manager, Stacey Wiggins, recommended John Morgans, also a former District Manager of Shoes and Jewelry. The fact that Ms. Wiggins, who also is female, did not recommend Complainant for the position, also dispels any possible inference of discriminatory animus on the basis of Complainant's gender. *See Drummond v. International Inc.*, 400 F. Supp.2d 521, 526 (E.D.N.Y. 2005) ("a well-recognized inference against discrimination exists where the person who

D00002284

Rene Sanchez
June 30, 2006
Page 9

participated in the allegedly adverse decision is also a member of the same protected class").

As to Complainant's claim that she was discriminated against because of her age, Complainant has no evidence that the Wal-Mart managers who made the hiring recommendations even knew her age or harbored any discriminatory animus because of her age. In fact, Ms. Wiggins did not know the age of either Mr. Morgans or Complainant at the time she recommended that Mr. Morgans be offered the Fashion District Merchandiser position over Complainant and the other applicants.[9] In addition, the fact that Mr. Eaton, who is 63 years old, recommended other candidates and not Complainant, dispels any possible inference of discriminatory animus on the basis of Complainant's age (61).  *See Drummond*, 400 F. Supp.2d at 526.

The claim for disability discrimination also fails.  First, there is no evidence that Complainant suffered (or suffers) from a disability within the meaning of the ADA.  In her Charge, Complainant makes only the conclusory statement that she is a "qualified individual with a disability," but she does not identify the alleged disability.  Second, Complainant cannot establish that Wal-Mart had notice of her alleged disability.  There is no evidence that Complainant suffers from any impairment that rises to the level of a disability under the ADA, or that Wal-Mart or any of the decision makers with respect to any position Complainant complains about had any knowledge of such a disability.  For these reasons and the other reasons set forth in this Statement of Position, Complainant's ADA claim fails also.

There is simply no evidence that Complainant's age, gender or unidentified disability played a role in her not getting any of the positions that she applied for.  However, even assuming, *arguendo*, that Complainant could establish a *prima facie* case of discrimination with respect to any of the positions, which she cannot, Wal-Mart had legitimate reasons for choosing other applicants.  Namely, in Wal-Mart's opinion, Complainant was not the best candidate for the positions.  Complainant cannot show that any action taken with respect to her was the result of any unlawful discrimination.

Complainant has not set forth any evidence to refute Wal-Mart's legitimate reasons for the decisions.  To the extent that Complainant may disagree with Wal-Mart's decisions, Complainant's own opinion does not rebut Wal-Mart's legitimate reasons for its decisions or raise any inference of discrimination.  In fact, as the court stated in *Centeno v. NYC*, 2005 U.S. Dist. LEXIS 41895, *24 (E.D.N.Y. May 12, 2005), "hiring decisions are often subjective, and an employer's 'judgment in selecting and applying subjective criteria may be poor, and it may be erroneous, as long as it is not discriminatory.'"

---

[9]  Ms. Wiggins conducted the interviews by telephone.  Because, among other things, she had never met Mr. Morgans, she did not know his age, or his age relative to Complainant.

Rene Sanchez
June 30, 2006
Page 10

E.    Conclusion

There is simply no evidence to substantiate Complainant's unfounded allegations of unlawful discrimination. Accordingly, Wal-Mart respectfully requests that the Complaint be dismissed without further investigation.

Thank you for your courtesy in this matter.

Very truly yours,

Patricia Le Goff

PL/aml
Attachments

# EXHIBIT A

D00002287

# **O**ur Beliefs

As Wal-Mart continues to grow, we remain true to Mr. Sam's

# Three Basic Beliefs:

## Respect for the Individual

## Service to our Customers

## Strive for Excellence

As a Wal-Mart Associate, you are what people will remember about Wal-Mart Stores, Inc. You are the reason our customers will choose to come back. If you truly enjoy what you do, you can't help but live out these beliefs. And then, a really incredible thing happens: others will catch the passion from you.

### Respect for the Individual

Our Company is built on some very simple and basic values and beliefs. The foundation of our people philosophy is that Our People Make the Difference.

We use first names at Wal-Mart. This promotes the warm, friendly atmosphere and working environment our Customers/Members and Associates expect. We treat all our Associates with respect and dignity, and fully support equal-opportunity employment and maintaining a workplace free of harassment of any kind.

Wal-Mart is committed to ensuring that our Associates represent the diversity of our Customers/Members and the communities we serve. Wal-Mart will not tolerate discrimination in employment on the basis of race, color, age, sex, sexual orientation, religion, disability, ethnicity, national origin, veteran status, marital status or any other legally-protected status. Any such discrimination against a Customer/Member or Supplier is also strictly prohibited.

We do not tolerate discrimination of any kind. Not only is discrimination against our beliefs, but it's also against the law.



*Pictured above: Lee Scott,*
*President and CEO, Wal-Mart Stores, Inc.*

D00002288



BROWN RAYSMAN MILLSTEIN FELDER & STEINER℠

Patricia LeGoff
Associate
(212) 895-2354
plegoff@brownraysman.com

June 30, 2006

<u>VIA FACSIMILE 617-565-3196 AND</u>
<u>REGULAR MAIL</u>

Rene Sanchez, Investigator
U.S. Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center
Room 475
Boston, MA 02203-0506

      Re:   *Zukaitis v. Wal-Mart*
            Charge No.: 165-2005-01461

Dear Mr. Sanchez:

      As counsel to Respondent Wal-Mart ("Wal-Mart"),[1] we submit this Statement of Position and the annexed exhibits in response to the Charge of Discrimination filed by Complainant, Linda Zukaitis ("Complainant"). Complainant erroneously alleges that Wal-Mart discriminated against her on the basis of her gender (female), and age (52) in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").[2]

---

[1] The Complainant improperly identifies "Wal-Mart" as the only respondent in this matter.

[2] Please note that this response includes confidential information not to be disclosed without the written approval of Wal-Mart Stores, Inc. *See*, 42 U.S.C. §§ 2000e-5(b); 2000e-8(e); 29 C.F.R. §§1601.22, 1601.26; 56 Fed. Reg. 10847. In addition, this response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the EEOC in its investigation and facilitating the informal resolution of these matters. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the Wal-Mart's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Complainant's allegations. Because additional facts likely would be uncovered through discovery or following a full investigation, Wal-Mart in no way waives its right to present new or additional

D00002298

Rene Sanchez
June 30, 2006
Page 2


A.     The Company

       Wal-Mart is dedicated to providing quality items for retail sale to consumers and to
making significant contributions to the communities it serves.  Wal-Mart conducts business
operations throughout the United States, including the operation of stores in many communities
throughout the State of New York.  As Wal-Mart strongly desires to be a positive model of
corporate practices in the communities in which it does business, it is sensitive to the rights of its
associates and endeavors to protect those rights to the fullest extent possible.

B.     Wal-Mart's Anti-Discrimination Policy

       Wal-Mart explicitly prohibits discrimination.  Wal-Mart's Policy provides, in pertinent
part:

              Wal-Mart is committed to ensuring that our Associates represent
              the diversity of our Customers/Members and the communities we
              serve.  Wal-Mart will not tolerate discrimination in employment on
              the basis of race, color, age, sex, sexual orientation, religion,
              disability, ethnicity, national origin, veteran status, marital status or
              any other legally-protected status.  Any such discrimination against
              a Customer/Member or Supplier is also strictly prohibited.

              We do not tolerate discrimination of any kind.  Not only is
              discrimination against our beliefs, but it's also against the law.

*See* Associate Guide, p. 10, attached as Exhibit A.

C.     Complainant's Employment History With Wal-Mart

       Wal-Mart Store #1610 in Greece, New York hired Complainant as an hourly associate in
June, 1991.  Since that time, Complainant has held a number of other positions, including
District Manager of Shoes and Jewelry.  As a District Manager of Shoes and Jewelry,
Complainant had responsibility for certain aspects of the jewelry and shoe departments in Wal-
Mart Stores within a particular Wal-Mart geographic district.  Among other things, District
Managers of Shoes and Jewelry were charged with the responsibility for maximizing the sales
and profits of those departments.  Complainant held this position until May 2005, when Wal-
Mart eliminated the position as part of the reorganization.  As a result of the reorganization, the

information at a later date, for substance or clarification.  Moreover, by responding to this charge, Wal-Mart does
not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the charge and
Complainant's allegations.

D00002299

Rene Sanchez
June 30, 2006
Page 3

associates who held the position of District Manager of Shoes and Jewelry, including
Complainant, had to look for new employment opportunities.

1.   Overview of a Store's Management Structure

Individual Wal-Mart Stores are run by a Store Manager, who has overall responsibility
for the entire Store, including responsibility for all matters relating to personnel and financial
issues.   Among other things, Store Managers must have overall knowledge of general
merchandising, customer flow and shopping patterns, and be able to forecast and develop sales
budgets for the entire store.

Co-Managers report directly to the Store Managers.  Co-Managers are expected to have
overall knowledge of the Store's operations and be able to run and operate the Store in the
absence of the Store Manager.[3]  The next level of management below the Co-Manager is the
Assistant Manager.  An Assistant Manager, among other things, has more direct supervisory
responsibilities over hourly associates and is expected to motivate and manage associates.  An
Assistant Manager, unlike a Co-Manager and a Store Manager, is charged with the responsibility
of overseeing a Department or Departments within the Store, rather than overseeing the
operations of the Store as a whole.

Store Managers report to a District Manager, who has overall responsibility for all Wal-
Mart Stores within a specific Wal-Mart geographic district.  Complainant, as a District Manager
for Shoes and Jewelry, was the District Manager for a "specialty division," with responsibility
only for specific departments within each Store in the District.  The District Manager of a
specialty division reports to a Regional Manager of the specialty division, and has significantly
less responsibility than does a District Manager.  Indeed, the District Manager of a specialty
division has responsibility that is significantly more limited than that of Store Managers, Co-
Managers or even Assistant Managers, because their range of responsibility is focused on *sales*
in a specific Department.  The overall *management* of the Department is the responsibility of the
Assistant Manager.

2.   Complainant Applies for Fashion Merchandiser Positions

In May, 2005, as part of its reorganization, Wal-Mart created the position of District
Fashion Merchandiser.  The Fashion Merchandiser position encompassed a much wider range of
duties and responsibilities than had the position of District Manager of Shoes and Jewelry.  For
instance, unlike Shoes and Jewelry District Managers, who were responsible for certain tasks in

_____

[3] There may be instances where the needs of the particular Store require a Co-Manager to be more specialized in a
particular area of the Store.

Rene Sanchez
June 30, 2006
Page 4

only two Departments, Fashion Merchandisers have overall responsibility for evaluating sales and profit trends, managing overall inventory and shrink and implementing merchandising setup, displays and features for apparel generally. In addition, Fashion Merchandisers must have knowledge of merchandising and cross-merchandising procedures, including choosing displays for the apparel, setting up and directing the set-up of the displays. Among other things, the Fashion Merchandisers work with and assist the managers of the Store in promoting apparel merchandise and planning the Apparel Departments based on the season and the needs of customer. There are far fewer District Fashion Merchandiser positions than District Managers of Shoes and Jewelry positions.

Complainant applied for a number of District Fashion Merchandiser positions which she did not receive because Wal-Mart viewed other applicants as being better qualified. One such position Complainant applied for was a District Fashion Merchandiser position in Montoursville, Pennsylvania. District Manager, Randy Sims, recommended Shawn Earley for the position. Mr. Earley, who was a Shoes and Jewelry District Manager when he applied for the position, had been an Assistant Manager for three years and a Co-Manager for more than a year. In contrast, Complainant had no Assistant Manager or Co-Manager experience. Thus, in Wal-Mart's opinion, Mr. Earley was viewed as more experienced and better qualified than Complainant for the District Fashion Merchandiser position.

Complainant also applied for a Fashion Merchandiser position in Greece, New York. Again, in Wal-Mart's view, Complainant was not the most qualified applicant. Wal-Mart offered the position to Brian Radcliffe, who held the position of Regional Manager, Specialty Division, for more than two years before being offered the position. Mr. Radcliffe, who was Complainant's supervisor for a time, had more experience then Complainant and was better qualified than Complainant for the position.

    3.    Complainant Applies for Co-Manager Positions

In addition to applying for Fashion Merchandiser positions, Complainant also applied for three Co-Manager positions. Wal-Mart did not believe that Complainant was the most qualified person for the Co-Manager positions. Among other factors, Complainant did not have any experience as an Assistant Manager or a Co-Manager.

Complainant applied for two Co-Manager positions in the Geneseo, New York, Wal-Mart, Store # 1966. As to the first Co-Manager position, Al Jenkins, District Manager, was seeking to fill a Co-Manager position that, based on the needs of the Store at that time, required particular food experience. Mr. Jenkins recommended Ronald Oriel for the position. Unlike Complainant who had no experience as an Assistant Manager, Mr. Oriel had been an Assistant Manager for three years prior to applying for the Co-Manager position. In addition, Mr. Oriel

D00002301

Rene Sanchez
June 30, 2006
Page 5

was more qualified than Complainant because of his experience in the food industry. Mr. Oriel had worked as a meat manager at Sam's Club for three years prior to working as an Assistant Manager at Wal-Mart. In contrast, to Mr. Jenkins' understanding, Complainant had no specific knowledge of, or experience in, the food industry.

Mr. Jenkins recommended Assistant Manager, Edward Narrod, to fill the other Co-Manager position in Wal-Mart Store # 1966. In Mr. Jenkins' opinion, Mr. Narrod was more qualified than Complainant for the position. Among other things, Mr. Narrod was an Assistant Manager for almost four years before applying for a Co-Manager position. In contrast, Complainant was never an Assistant Manager.

In June, 2005, Complainant applied for a Co-Manager position in Auburn, New York. Patti Allen, District Manager, recommended District Manager of Shoes and Jewelry, Laurie Bennett, for the Co-Manager position. In Ms. Allen's opinion, Ms. Bennett was more qualified for the position because, among other things, Ms. Allen worked with Ms. Bennett when Ms. Bennett was a District Manager of Shoes and Jewelry and was familiar with the high quality of her work. In addition, Ms. Bennett had about six years' prior experience as an Assistant Manager, experience which Complainant lacked.

On August 15, 2005, Complainant advised Wal-Mart that she wanted to resign, and she accepted a severance of $15,012.69. *See* Complainant's Exit Interview Form, attached as Exhibit B.

D.     **Complainant's Allegations and Wal-Mart's Response**

Complainant erroneously alleges that she did not get the positions she applied for (outlined above) as a result of discrimination based on her age (52) and her gender (female). In fact, Wal-Mart had bona fide business reasons for not offering her these positions. As discussed above, Wal-Mart believed that other candidates were better qualified for the positions Complainant sought. Other than the fact that she did not get the positions for which she applied, Complainant offers absolutely no evidence to support her claim of discrimination.

1.     The Decisions Not To Offer Complainant a Fashion Merchandiser Position Was Not Discriminatory.

Complainant contends, without factual support, that Wal-Mart discriminated against her by not offering her either of the two Fashion Merchandiser Positions for which she applied. This is not true.

D00002302

Rene Sanchez
June 30, 2006
Page 6

Based on the judgment of the managers who made the recommendations and the information available to them, Complainant was not viewed as the most qualified applicant for each position. Complainant has not offered any evidence that her age or gender played a role in the decision not to hire Complainant for any position for which she applied.

To establish a *prima facie* case of discrimination based on her gender or age, Complainant must show that: (1) she is a member of the protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the circumstances give rise to an inference of discrimination. *Centeno v. NYC*, 2005 U.S. Dist. LEXIS 41895, *11 (E.D.N.Y. May 12, 2005), *aff'd*, 164 Fed. Appx. 167 (2d Cir. 2006). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fisher v. Vassar College*, 114 F.3d 1332, 1344 (2d Cir. 1997).

Here, Complainant cannot establish the last element of her *prima facie* case. Complainant has no evidence that discriminatory animus played any role in Wal-Mart's decisions.

As stated above, in Wal-Mart's opinion, Complainant was not the most qualified applicant for either District Fashion Merchandiser positions. As to the Fashion Merchandiser position in Montoursville, in Wal-Mart's opinion, Mr. Earley was more qualified than Complainant because, among other things, Mr. Earley had prior experience as a Co-Manager and Assistant Manager. With respect to the Fashion Merchandiser position in Greece, New York, in Wal-Mart's view, Mr. Radcliffe was more qualified than Complainant because, among other things, he had been Complainant's supervisor and held the position of Regional Manager, Specialty Division, for more than two years before being offered the Fashion Merchandiser position.

As to Complainant's claim that she was discriminated against because of her age, Complainant has no evidence that the managers who made the recommendations even knew her age or harbored any discriminatory animus because of her age.

In addition, the fact that Mr. Jenkins, who is 59 years old, recommended Mr. Radcliffe for the position, and that Mr. Sims, who is 54 years old, recommended Mr. Earley for the position dispels any possible inference of discriminatory animus on the basis of Complainant's age (52). *See Drummond v. International Inc.*, 400 F. Supp.2d 521, 526 (E.D.N.Y. 2005) ("a well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class.")

Assuming, *arguendo*, that Complainant could establish a *prima facie* case of discrimination, which she cannot, Wal-Mart had legitimate reasons for choosing other applicants

D00002303

Rene Sanchez
June 30, 2006
Page 7

over Complainant. Namely, as set forth above, in Wal-Mart's opinion, Complainant was not the best candidate for the positions. Complainant has set forth no evidence to refute Wal-Mart's legitimate reasons for the decisions and Complainant's own belief that she was more qualified than the applicants chosen for the positions does not refute Wal-Mart's legitimate reason. In fact, the courts have explained that they are not to second guess an employer's hiring decisions. *See Centeno v. NYC*, 2005 U.S. Dist. LEXIS 41895, *24 (E.D.N.Y. May 12, 2005) ("hiring decisions are often subjective, and an employer's 'judgment in selecting and applying subjective criteria may be poor, and it may be erroneous, as long as it is not discriminatory.'")

2.   The Decisions Not To Offer Complainant A Co-Manager Position Was Not Discriminatory

As set forth above, Complainant applied for three Co-Manager positions. In Wal-Mart's opinion, Complainant was not the most qualified applicant for the positions.

Complainant applied for two Co-Manager positions in the Geneseo Wal-Mart Store. As to the first Co-Manager position, Mr. Jenkins recommended Mr. Oriel for the position, because, among other things, Mr. Oriel, unlike Complainant, had significant experience as an Assistant Manager prior to applying for the Co-Manager position. In addition, Mr. Oriel had experience in a food department. Mr. Jenkins understood that Mr. Oriel had worked as a meat manager at Sam's Club for three years prior to working as an Assistant Manager at Wal-Mart. In contrast, to Mr. Jenkins' knowledge, Complainant had no experience in the food industry.

As to the second Co-Manager position in Geneseo, Mr. Jenkins recommended Mr. Narrod to fill the position. In Mr. Jenkins' opinion, Mr. Narrod was more qualified than Complainant for the position. Among other things, Mr. Narrod, had four years experience as an Assistant Manager, whereas Complainant had no assistant manager experience.

With respect to the third Co-Manager position, Ms. Allen recommended Ms. Bennett for the position. In Ms. Allen's opinion, Ms. Bennett was more qualified for the position. Among other things, Ms. Allen had worked with Ms. Bennett when Ms. Bennett was a District Manager of Shoes and Jewelry and was familiar with her work. Ms. Bennett had about six years prior experience as an Assistant Manager, experience which Complainant lacked.

Furthermore, any inference of discrimination with respect to this Co-Manager position is refuted by the facts that Ms. Allen is in the same protected class as Complainant, and that the position was given to another female applicant. Ms. Bennett. *See McCalman v. Partners In Care*, 2003 U.S. Dist. LEXIS 17211, *21 (S.D.N.Y. Sept. 30, 2003) (inference of discrimination belied by the fact that one of the individuals promoted to the position sought by plaintiff is in the same protected class as plaintiff); *See Drummond*, 400 F. Supp.2d at 526 ("a well-recognized

D00002304

Rene Sanchez
June 30, 2006
Page 8

inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class.")

Assuming, *arguendo*, that Complainant could establish a *prima facie* case of discrimination, which she cannot, Wal-Mart had legitimate reasons for choosing other applicants; Complainant was not the best candidate for the positions.

E.    **Conclusion**

There is simply no evidence to substantiate Complainant's unfounded allegations of unlawful discrimination. Accordingly, Wal-Mart respectfully requests that the Complaint be dismissed without further investigation.

Thank you for your courtesy in this matter.

Very truly yours,

Patricia Le Goff

PL/aml

Attachments

# EXHIBIT A

D00002306

# Our Beliefs

As Wal-Mart continues to grow, we remain true to Mr. Sam's

## Three Basic Beliefs:

Respect for the Individual

Service to our Customers

Strive for Excellence



As a Wal-Mart Associate, you are what people will remember about Wal-Mart Stores, Inc. You are the reason our customers will choose to come back. If you truly enjoy what you do, you can't help but live out these beliefs. And then, a really incredible thing happens: others will catch the passion from you.

### Respect for the Individual

Our Company is built on some very simple and basic values and beliefs. The foundation of our people philosophy is that Our People Make the Difference.

We use first names at Wal-Mart. This promotes the warm, friendly atmosphere and working environment our Customers/Members and Associates expect. We treat all our Associates with respect and dignity, and fully support equal-opportunity employment and maintaining a workplace free of harassment of any kind.

Wal-Mart is committed to ensuring that our Associates represent the diversity of our Customers/Members and the communities we serve. Wal-Mart will not tolerate discrimination in employment on the basis of race, color, age, sex, sexual orientation, religion, disability, ethnicity, national origin, veteran status, marital status or any other legally-protected status. Any such discrimination against a Customer/Member or Supplier is also strictly prohibited.

We do not tolerate discrimination of any kind. Not only is discrimination against our beliefs, but it's also against the law.



*Pictured above: Lee Scott,*
*President and CEO, Wal-Mart Stores, Inc.*

10

D00002307

# EXHIBIT B

D00002308

# EXIT INTERVIEW

WMP-39 Revised 04/83

An Exit Interview is to be conducted for all Associates leaving the employment of Wal-Mart Stores, Inc. DATE OF TERMINATION MUST BE THE LAST DAY WORKED, EXCEPT IN CASES OF A LEAVE OF ABSENCE, SUSPENSION, OR 3 DAYS UNREPORTED ABSENCE.

Associate Name **Linda Zikaras**                    Social Security No. **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†**

Associate ID No. _____   Facility/Dept./Store # _____   ☐ Hourly   ☒ Management

Actual Last day Worked **8/15/05**                   Vacation Avail (Mgmt. Only) **0**

Updated Address and Phone Number: **5755 County Rd 33, Canandaigua, NY 14424**
**585-229-7403**

Detailed Statement of Termination. This Section Needs To Be Completed By The Associate for Voluntary Termination or By The Manager/Supervisor for Involuntary Terminations. (Please be specific.)

---

## VOLUNTARY TERMINATION
### (Eligible to re-apply)

| | | |
|---|---|---|
| 03 | **X** | Not Available For Work (NVL) |
| 04 | ___ | Failure to Return From L.O.A. (NRL) |
| 05 | ___ | Refused Offer of Work (ROW) |
| 06 | ___ | Job Abandonment/Three Days Unreported Absence (DUA) |
| 10 | ___ | To Leave the Area (LTA) |
| 16 | ___ | Child Care/Dependent Care Issues (CHI) |
| 17 | ___ | Due to Health (DTH) |
| 20 | ___ | Work Hours (HRS) |
| 21 | ___ | Salary (PAY) |
| 22 | ___ | Working Conditions (WOR) |
| 24 | ___ | Benefits (BEN) |
| 25 | ___ | Career Opportunities (PRM) |
| 28 | ___ | Supervisor (SUP) |
| 29 | ___ | Walked Off Job (WOJ) |
| 30 | ___ | Stay at Home (SAH) |
| 31 | ___ | Attend School (EDU) |
| 85 | ___ | Retirement (RTD) |
| 106 | ___ | Failure to Produce Employment Documents in a Timely Manner (FTP) |

## INVOLUNTARY TERMINATION
### (Eligible to re-apply)

| | | |
|---|---|---|
| 37 | ___ | Misconduct w/Coachings (CON) |
| 47 | ___ | Excessive Absences and/or Tardies (EAT) |
| 53 | ___ | Insubordination (INS) |
| 55 | ___ | Inability to Perform Job (IPJ) |
| 66 | ___ | 1st Violation of Fraternization Policy (FVP) |
| 72 | ___ | Unintentional Violation of Corporate HIPAA* Privacy Policy (UVH) *Health Insurance Portability and Accountability Act |
| 75 | ___ | Deceased (Call Profit Sharing & Life Ins.) (DEA) |
| 92 | ___ | Lack of Work (Job Eliminated, Location Closed, Reduction in Force) (LOW) |
| 97 | ___ | End of Temporary Assignment (ASC) |

## INVOLUNTARY TERMINATION
### (Mandatory No Rehire)

| | | |
|---|---|---|
| 77 | ___ | Intentional Violation of Corporate HIPAA* Privacy Policy (IVH) *Health Insurance Portability and Accountability Act |
| 78 | ___ | Gross Misconduct - Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets) (GMI) |
| 79 | ___ | Gross Misconduct - Other (GMO) |
| 99 | ___ | 2nd Violation of Fraternization Policy (FRA) |
| 107 | ___ | Falsification of Employment Documents (FED) |

Re-Hire Recommended ☒ Yes   ☐ No (Explain-General Comments) _____

The following Wal-Mart property must be collected at the time of Exit Interview: (Please check all that apply)
( ) Badge      ( ) Discount Card(s)      ( ) Weight Belt      ( ) Other _____
( ) Smock      ( ) Company Credit Cards/Phone card      ( ) Box Cutter

NOTE:   To be considered for re-employment, you must re-apply. Your previous work record with Wal-Mart will be reviewed. The Company assumes no obligation to contact you for possible re-employment. Where state law allows, a Neutral Reference will be provided to external employers seeking information regarding your employment with Wal-Mart Stores, Inc. Dates of employment and last position held is the only information that will be released.

_Linda Zikaras 9/20/05_
ASSOCIATE                          DATE

_Susan Loope  9/20/05_
HOURLY SUPERVISOR                  DATE

_____   _9-X-05_
SALARIED MEMBER OF MANAGEMENT       DATE

FACILITY MANAGER                    DATE

D00002309

# Exhibit 2

## Supplemental Benefits Documentation
Board of Directors Retreat FY06
Wal-Mart Stores, Inc.

# Reviewing and Revising Wal-Mart's Benefits Strategy

*Memorandum to the Board of Directors*
*from Susan Chambers*

The purpose of this memorandum is to update you on our efforts to review and revise Wal-Mart's benefits strategy. In response to concerns about cost trends and growing public scrutiny, I, with the support of McKinsey & Company, recently led a 15-person team, drawn from across the company, in 1) evaluating Wal-Mart's approach to benefits, and 2) developing a strategy to address any shortcomings.

We evaluated Wal-Mart's current benefits offering through three lenses – cost trends, Associate satisfaction, and public reputation – and are now recommending revisions to our benefits strategy built around nine "limited-risk" initiatives and five "bold steps." While we continue to refine our thinking, I wanted to take this opportunity to share with you the breadth of our considerations, to highlight the direction we are headed, and to solicit feedback that will guide our final recommendations.

This memorandum summarizes our work and is divided into three sections:

¶ *Section 1* provides a detailed analysis of the three most significant benefits-related challenges we face:

- Growth in benefits costs is unacceptable (15 percent per year) and driven by fundamental and persistent root causes (e.g., aging workforce, increasing average tenure). Unabated, benefits costs could consume an incremental 12 percent of our total profits in 2011, equal to $30 billion to $35 billion in market capitalization.

- While Associates are satisfied overall with their benefits, they are opposed to most traditional cost-control levers (e.g., higher deductibles for health insurance). Satisfaction also varies significantly by benefit and by segment of Associates. Most troubling, the least healthy, least productive Associates are more satisfied with their benefits than other segments and are interested in longer careers with Wal-Mart.

- Wal-Mart's healthcare benefit is one of the most pressing reputation issues we face because well-funded, well-organized critics, as well as state government officials, are carefully scrutinizing Wal-Mart's offering.  Moreover, our offering is vulnerable to at least some of their criticisms, especially with regard to the affordability of coverage and Associates' reliance on Medicaid.

¶ *Section 2* discusses in detail the nine limited-risk initiatives and five bold steps we are recommending.  Given conflicts inherent in the challenges we face, any set of solutions will require carefully balancing, and sometimes making trade-offs between, cost, Associate satisfaction, and public reputation.

- **Limited-risk initiatives:**  We are recommending that Wal-Mart realign eligibility requirements for health insurance; decrease cross-subsidization of spouses; give Associates more information about how to use healthcare and health insurance; lower company-paid life insurance coverage levels; capture savings from current initiatives to improve labor productivity; add a combination of best practice care management programs; further develop high-performance provider networks; offer Associates bundles of other benefits (e.g., paid time off) from which to choose; and continue to explore adding health clinics in stores.  These initiatives will reduce costs and will slightly improve Associate satisfaction.

- **Bold steps:**  The nine limited-risk initiatives will not fully address all the benefits-related challenges we face.  To fully address these challenges, we recommend that Wal-Mart take five bold steps that will require more explicit trade-offs between cost, Associate satisfaction, and public reputation.  The first two recommended steps primarily address cost trends, the third addresses attracting a healthier workforce, and the last two steps address improving our public reputation.

  - Move all Associates to "progressively designed" consumer-driven health plans to help control cost trends while allowing Associates to build up savings in Health Savings Accounts.

  - Restructure the retirement program (i.e., profit sharing and 401(k) program) to reduce costs and help Associates better save for retirement.

- Redesign benefits and other aspects of the Associate experience, such as job design, to attract a healthier, more productive workforce.

- Make some select strategic investments in our healthcare offering (e.g., lower maximum out-of-pocket expenses) so it can better withstand external scrutiny.

- Improve communication of Wal-Mart's benefits offering so we get more credit for what we provide, and, over the long-term, work to shape state and national outcomes on healthcare.

¶ *Section 3* summarizes the combined impact of the limited-risk initiatives and the bold steps. The team believes this new strategy will bring powerful advantages to Wal-Mart, including:

- Maintaining benefits spend at or below today's level as a percentage of sales;

- Offering a more attractive benefits package for healthy Associates;

- Better positioning us to fight Wal-Mart's critics.

We presented this material to the Executive Benefits Steering Committee (Tom Hyde, Lawrence Jackson, and Tom Schoewe) in late July. They received the recommendations enthusiastically and asked that we share them widely within Wal-Mart, something we have begun to do. They also asked that the team continue to test and refine the strategy, especially with Associates and external stakeholders. Our aspiration is to complete this work by late September, receive Executive Committee approval on the overall strategy by early October, and hold a special session with you in November for further discussion.

# 1 Major Benefits-Related Challenges

We analyzed the benefits-related challenges facing Wal-Mart through three lenses – cost trends, Associate satisfaction, and public reputation.

## COST TRENDS

From 2002 to 2005, our benefits costs grew significantly faster than sales, rising from 1.5 percent of sales to 1.9 percent.  Benefits spend grew from $2.8 billion to $4.2 billion during this period, at a rate of 15 percent per year.  Striving to hold benefits costs as a percent of sales constant is critical for Wal-Mart's long-term economic success.

A few benefits made up the bulk of this increase:  healthcare ($1.5 billion) grew by 19 percent, paid time off ($1.4 billion) grew by 14 percent, and the profit sharing and 401(k) program ($740 million) grew by 13 percent.  (Over the period, the domestic Associate base grew at 5 percent and domestic sales grew at 11 percent.)

Increased utilization of medical services, which grew by 10 percent per year, was the primary driver of the rapid growth in our healthcare costs (Exhibit 1).  Almost half of this utilization growth was due to three Wal-Mart-specific workforce factors (distinct from national trends):

- ¶ Our workforce is aging faster (0.50 years per calendar year) than the national average (0.12 years per calendar year).

- ¶ Our workers are getting sicker than the national population, particularly with obesity-related diseases.  For example, the prevalence of coronary artery disease in Wal-Mart's population grew by 6 percent compared to a national average of 1 percent, and the prevalence of diabetes in our population grew by 10 percent compared to a national average of 3 percent.  (That said, our workforce is no sicker at present in absolute terms than the national population.)

- ¶ A segment of our workforce consumes healthcare inefficiently, in a pattern similar to a Medicaid population.  Our population tends to over

utilize emergency room and hospital services and underutilize prescriptions and doctor visits.  This pattern is most evident among our low-income Associates, and one hypothesis is that this behavior may result from prior experience with Medicaid programs.

Compounding these problems are several national trends, such as the increased use of technological innovations, which are driving increased utilization of medical services across the U.S. healthcare system.

The cost of Wal-Mart's profit-sharing and 401(k) program and paid time off grew faster than overall Associate growth, due largely to increasing Associate tenure. Over the past 4 years, the average Associate tenure has increased by 0.2 months per calendar year. As a result, more Associates qualify for participation in benefits programs like the profit sharing and 401(k) plan and for more paid time off.  An even more important factor is wages, which increase in lock-step with tenure and directly drive the cost of many benefits (e.g., 401(k) is a percentage of wages).  Given the impact of tenure on wages and benefits, the cost of an Associate with 7 years of tenure is almost 55 percent more than the cost of an Associate with 1 year of tenure, yet there is no difference in his or her productivity (Exhibit 2).  Moreover, because we pay an Associate more in salary and benefits as his or her tenure increases, we are pricing that Associate out of the labor market, increasing the likelihood that he or she will stay with Wal-Mart.

We have also not effectively leveraged our benefits spend per Associate, which should be thought of as a fixed cost for employing that Associate.  We have allowed our full-time Associates to average only 34 hours of work per week; increasing the hours worked per Associate would enable Wal-Mart to lower our labor cost per hour by spreading benefits costs over more hours.  We also have one of the highest percentages of full-time Associates in the retail industry, even though full-time Associates are more expensive per labor hour (in terms of both benefits and wages).


## ASSOCIATE SATISFACTION

Associates are satisfied with their overall benefits package, but they have expressed significant opposition to most traditional cost-control levers.  For instance, Associates strongly oppose higher deductibles or limits to their choice of providers.  Satisfaction varies significantly, however, by benefit and by segment of Associate, creating an opportunity to rebalance the benefits portfolio to improve satisfaction while reducing costs.  In particular, the least healthy, least

productive Associates are more satisfied with their benefits than other segments and are interested in longer careers with Wal-Mart.

Overall, Associates are satisfied with their benefits relative to peers at other retailers.  In a survey of retail workers, Associates ranked Wal-Mart's benefits above the industry average in availability, ability to qualify, quality, and execution (e.g., claims processing).  The cost of healthcare coverage was the only factor on which we scored poorly.

Associate satisfaction and view of importance vary significantly by specific benefit (Exhibit 3).  For example, Associates rank health insurance as the most important benefit Wal-Mart offers, but they also say it is the one with which they are least satisfied.  The stock purchase plan, the profit sharing and 401(k) program, and life insurance are all ranked high-satisfaction, low-importance, suggesting an opportunity to rebalance Wal-Mart's investment in these benefits into other more important benefits.  Paid time off and the discount card are the only high- satisfaction, high-importance benefits.

Associate satisfaction with benefits also varies significantly by segment of Associates.  The team analyzed the Associate population on a wide variety of factors (e.g., attitude, health behavior, tenure), the most fruitful of which was annual healthcare spend.  The so-called "low utilizers" are the most attractive Associate segment because they cost Wal-Mart less in terms of healthcare expenses and are more productive in their jobs.  (Productivity findings were based on analysis of individual cashier items per hour data.)   Moreover, this segment also showed healthier behaviors, specifically less prevalence of obesity. Unfortunately, the "low utilizers" were also least satisfied with our benefits and were planning shorter careers with Wal-Mart.  This segment favors a different type of benefits package than do the "high utilizers," and different than what we offer today:  health insurance more closely modeled on consumer-driven health plans – lower premiums, higher deductibles, and health savings accounts.  They also prefer certain non-medical benefits, such as help in saving to purchase a home and help in paying for more education, neither of which do we offer in a robust way today.

It is worth noting, however, that overall benefits only play a small role in attracting Associates to Wal-Mart and in keeping Associates satisfied while at Wal-Mart. Our benefits offering played a key role in attracting just 3 percent of our Associates.  Moreover, satisfaction with benefits does not correlate with satisfaction with Wal-Mart.  A variety of factors – especially Associates' interactions with management – are more important.

## PUBLIC REPUTATION

Healthcare is one of the most pressing reputation issues facing Wal-Mart. Survey work done last summer shows that people's perception of our wages and benefits is a key driver of Wal-Mart's overall reputation.  Several groups are now mounting attacks against Wal-Mart focused on our healthcare offering.  These increasingly well-organized and well-funded critics – especially the labor unions and related groups, such as Wal-Mart Watch – have selected healthcare as their main avenue of attack.  Moreover, federal and state governments are increasingly concerned about healthcare costs, and many view Wal-Mart as part of the problem (a view due, in part, to the work of Wal-Mart's critics).  Medicaid costs are a major priority on most governors' agendas; already a quarter of states are spending more than 25 percent of their budgets on Medicaid, and observers across the political spectrum assert that the current system – with spiraling costs, a large population of uninsured, and an increasing number of medical bankruptcies – is unsustainable (although there is little consensus on what should take its place).  In this environment, we can expect efforts like those in Maryland (which is trying to mandate that companies spend a certain percentage of revenue on healthcare) and New Hampshire (which requires health services to track where Medicaid enrollees are employed) to accelerate. Proposals such as these, if successful, will bring added costs to Wal-Mart. Moreover, these battles with critics and governments are contributing to the decline of Wal-Mart's overall reputation.

Our healthcare offering is also vulnerable to attack.  We have not effectively communicated the generosity of our healthcare benefits to the general public; instead, we have thus far allowed our critics to frame the debate.  For instance, only 22 percent of Americans find it very believable that Wal-Mart provides health insurance to 900,000 people.  Wal-Mart's critics can also easily exploit some aspects of our benefits offering to make their case; in other words, our critics are correct in some of their observations.  Specifically, our coverage is expensive for low-income families, and Wal-Mart has a significant percentage of Associates and their children on public assistance.  Consider the following:

¶ On average, Associates spend 8 percent of their income on healthcare (premiums plus deductibles plus out-of-pocket expenses) for themselves and their families, nearly twice the national average.  The number varies significantly by plan type, rising to 13 percent for those on the Associate and Spouse plan.  In 2004, 38 percent of enrolled Associates spent more than 16 percent of the average Wal-Mart income on healthcare.

¶ Critics contend that the costliness of Wal-Mart's healthcare coverage causes it to enroll fewer Associates in its health insurance plan than do most national employers (48 percent versus 68 percent) (Exhibit 4).

¶ We also have a significant number of Associates and their children who receive health insurance through public-assistance programs. Five percent of our Associates are on Medicaid compared to an average for national employers of 4 percent. Twenty-seven percent of Associates' children are on such programs, compared to a national average of 22 percent (Exhibit 5). In total, 46 percent of Associates' children are either on Medicaid or are uninsured.

On both of these issues – affordability and public assistance – it is important to note that our offering and performance are on par with other retailers; Wal-Mart's critics, however, hold it to a "large company" standard, not a retailer standard. Despite the difference in industry economics, critics believe we should behave more like a GM or a Microsoft than a Target or a Sears. While critics have not yet harnessed all of these facts, they are successfully exploiting those they do have, suggesting that, when discovered, the others will also become effective ammunition.

# 2 Proposed Revisions to Benefits Strategy

Against the backdrop of these challenges, the team is recommending that Wal-Mart implement the nine limited-risk initiatives and five bold steps discussed in detail in this section.

## LIMITED-RISK INITIATIVES

These nine initiatives require little or no trade-off between cost, Associate satisfaction, and public reputation.  Exhibit 6 provides an overview of these initiatives:

1. **Realign eligibility requirements for health insurance** so that Associates (full-time and part-time) and their children could qualify after, for example, a defined number of hours.  This move would simplify external communications, make Wal-Mart even more competitive in the part-time labor market, and help align costs with the economics of the business (in that the benefit is based on hours worked).  On average, for example, a 1000 hour requirement would translate into 6 months for full-time Associates (same as today) and 1 year for part-time Associates (versus 2 years today).

2. **Decrease cross-subsidization of spouses** through higher premiums or other charges.  Spouses are by far the most expensive plan members to cover, and Wal-Mart pays more per spouse than per Associate.  This change would allow us to put more dollars towards Associates and their children.

3. **Give Associates more information about how to use healthcare and health insurance.**  Many Associates are making inefficient decisions about what healthcare services to use, e.g., relying too much on emergency rooms.  We need to give Associates more information on the cost and quality of specific health services, better educate them on how best to utilize healthcare, and develop education efforts specifically for those Associates who have previously been uninsured or on public assistance.

4. **Lower company-paid life insurance coverage levels** to a maximum payout of $12,000. Life insurance, although a small cost, is the fastest-growing benefits cost. It is also a high-satisfaction, low-importance benefit, which suggests an opportunity to trim the offering without substantial impact on Associate satisfaction. The company-paid policy currently covers one times an Associate's annual salary, which is slightly more generous than most retailers.

5. **Capture savings from current initiatives to improve labor productivity.** These initiatives include reducing the number of labor hours per store, increasing the percentage of part-time Associates in stores, and increasing the number of hours per Associate. These changes represent a major cost-savings opportunity with relatively little impact on existing Associates. The most significant challenge here is that the shift to more part-time Associates will lower Wal-Mart's healthcare enrollment (even with the more generous part-time offering outlined above), which could have an impact on public reputation.

6. **Add a combination of best practice care-management programs,** including utilization management, case management, disease management, and errors and omissions programs. These programs primarily improve quality of care, but we believe they may also produce modest cost savings by improving care coordination and compliance for extremely sick Associates, who drive a disproportionate share of the cost.

7. **Further develop high-performance provider (e.g., doctors, hospitals) networks,** so as to direct Associates to the most efficient and effective healthcare providers. The quality of care and cost of care vary significantly among doctors. We should be on the cutting edge of efforts to identify the best doctors by, for instance, working with payors to find new ways to identify them. We should then create provider networks made up only of those doctors and provide Associates with incentives for using them.

8. **Offer Associates bundles of other benefits (e.g., paid time off, education, discount card) from which to choose.** Our benefits package today is "one size fits all," even though different segments of Associates value specific benefits differently. For instance, one segment would happily give up some paid time off in exchange for a more generous discount card. While we believe every Associate on a Wal-Mart plan should have a core healthcare and retirement offering, we

could more effectively spend our remaining benefits dollars by allowing Associates to choose from among several packages of benefits.

9. **Continue to explore adding health clinics in stores.** Wal-Mart is starting an effort to put clinics in stores, a strategy currently framed as a real-estate opportunity. Over the long term, and with several important modifications (e.g., innovations to create lower-cost visits), these clinics could become an important part of our healthcare strategy, especially as a substitute for emergency room visits.

Taken together these nine initiatives should reduce Wal-Mart's projected healthcare costs from a projected 2.3 percent of sales in 2011 to a projected 2.0 percent of sales, largely due to the impact of Initiative 5 on productivity. The initiatives should also slightly improve Associate satisfaction. They will not likely have any significant impact – positive or negative – on public reputation.


## BOLD STEPS

The following five bold steps will be more difficult to execute than the limited-risk initiatives, but their impact will be much greater. Exhibit 7 provides an overview of these steps.


### Move all Associates to "progressively designed" consumer-driven health plans to help control cost trends, while allowing Associates to build up Health Savings Accounts

While relatively new in the United States, consumer-driven health plans have been proven to control medical cost trends more effectively than traditional plans in both domestic (e.g., Logan Aluminum) and international (e.g., Singapore) settings. In the place of traditional plans with deductibles, Associates get a Health Savings Account (HSA) or a pretax bank account for health expenses that is similar to a 401(k). An HSA can be funded from three sources: annual seed money from Wal-Mart, an annual contribution from the Associate, and a matching contribution from Wal-Mart. The Associate uses the HSA to cover his or her first-dollar medical expenses every year. When an Associate has used up his or her HSA, there may be a "bridge" the Associate must cover, which would be the difference between the amount in the HSA and the point at which coinsurance takes over (typically a level equivalent to a traditional high deductible plan).

Consumer-driven health plans are more effective at controlling costs than traditional plans because enrollees have greater responsibility for their healthcare spending. HSA funds *belong* to the Associate, so he or she has a stake in using the money wisely. If the Associate leaves Wal-Mart, the HSA funds go with him or her. If HSA contains money at the end of the year, those funds roll over for use in the following year. The bridge which an Associate with high healthcare expenses may face would also serve as a further brake on spending. Consumer-driven health plans are particularly attractive to the healthy, productive Associate segment, because this segment now "gets something" for enrolling in health insurance and staying healthy – they can save money in their HSA.

The key to achieving these advantages is to have the vast majority of Associates participate in HSA plans or other plans that incent behavior modification and cost control. Otherwise only the healthiest enroll and there is very little cost reduction because healthy people spend so little on healthcare. During this year's enrollment cycle, we are offering a few consumer-driven health plans, alongside many other options. These existing offerings can serve as an effective starting point for the transition.

Such plans would have several advantages for Associates. More than 80 percent of Associates would be better off financially under the proposed consumer-driven health plans than under traditional plans. Associates can also accumulate wealth in their HSAs. A typical Associate who is generally healthy would have $600 to $2,100 in savings after 3 years. Associates can use this wealth both for significant health events and retirement. Associates can also use their HSAs to cover a wide variety of health expenses, including vision, dental, preventive care, and other spending not covered by the plan.

To make this change palatable externally, the plan design must be "progressive," meaning it cannot involve any cost shifting. In transitioning to consumer-driven health plans, many companies have chosen to push more costs onto employees, a move that has given these plans a bad reputation among progressives. The plans proposed by the team do not involve any cost shifting. Moreover, a growing number of companies are implementing such plans, providing Wal-Mart with more political cover. Many retailers (e.g., Staples, Toys R Us) are offering consumer-driven health plans as one option among many, and the ever-progressive Whole Foods recently moved all of its employees to such a plan, to much media fanfare.

The primary reason for making this transition would be to reduce future benefits costs, and those savings would be significant: $400 million to $700 million in FY2011, all from reduced trend. This change does, however, come with several

challenges. Overall consumer-driven health plans are less popular with Associates than traditional plans, albeit not dramatically so, and are more difficult to communicate. Strong opposition is isolated to approximately 10 percent of Associates. Wal-Mart will also face reputation challenges in implementing this change given that progressives view such plans as a "Republican answer." Wal-Mart will have to be sophisticated and forceful in communicating this change internally and externally.

### Restructure the retirement program (i.e., the profit sharing and 401(k) program) to reduce costs and help Associates better save for retirement

We should reduce our overall investment in the profit sharing and 401(k) program from approximately 4 percent of wages to approximately 3 percent of wages. Doing so would bring the program more in line with retail offerings and would save Wal-Mart a substantial sum of money. Hewitt ranks our retirement program as the best in its non-union hourly retail benchmark set. Given the scrutiny that Wal-Mart receives on healthcare and that retirement is a low-importance benefit for Associates, the retirement program seems to be the wrong place for overinvestment.

We should also redesign the specifics of our retirement program. In particular, we should convert the 401(k) program from a "no-strings-attached" flat contribution to a matching program in which Associates receive funds from Wal-Mart based on the contribution they make to their 401(k). Such a program would help Associates better prepare for retirement. A fully participating career Associate would be able to replace 30 to 40 percent of his or her income at retirement, compared to 15 percent today, resulting in some 80 to 90 percent of income replaced at retirement (when Social Security is included).

Overall this proposal would save Wal-Mart a significant amount of money: $350 million to $400 million in FY2011. With respect to Associate satisfaction, Associates reacted positively to a matching retirement program, although they slightly preferred the current program. Although critics will contend that the new program is less generous than the current one, retirement has not been a major issue in the external environment.

**Redesign benefits and other aspects of the Associate experience,
such as job design, to attract a healthier, more productive workforce**

Given the significant savings from even a small improvement in the health of our
Associate base, Wal-Mart should seek to attract a healthier workforce.  The first
recommendation in this section, moving all Associates to consumer-driven health
plans, will help achieve this goal because these plans are more attractive to
healthier Associates.  The team is also considering additional initiatives to
support this objective, including:

¶ Design all jobs to include some physical activity (e.g., all cashiers do
  some cart gathering);

¶ Offer savings via the Discount Card on healthy foods (e.g., fruits and
  vegetables);

¶ Offer benefits that appeal to healthy Associates (e.g., an education
  offering targeted at students).

A healthier workforce will lead to lower health insurance costs, lower
absenteeism through fewer sick days, and higher productivity.  It will be far easier
to attract and retain a healthier workforce than it will be to change behavior in an
existing one.  These moves would also dissuade unhealthy people from coming
to work at Wal-Mart.  Even a modest shift in Wal-Mart's ability to attract and
retain a healthier workforce could result in significant savings:  $220 million to
$670 million in FY2011.  The key tasks in implementing this fourth bold step,
once the team has developed a more complete list of actions, are to create a
clear set of metrics to measure success, to run pilots in several stores to
understand each idea's effectiveness, and then roll out the most successful ones.

**Make a series of strategic investments in our healthcare offering so
it can better withstand external scrutiny**

The team is investigating several ideas to identify if there are targeted
investments or plan modifications we could make that would yield significant
reputational benefit.  The following are a couple of ideas being explored:

¶ To address concerns about affordability, maintain commitment to offer
  an insurance plan that covers Associates for $1/day (or $14 per pay
  period) and allows them to cover their children for another $1/day.

¶ To further address concerns about affordability, lower an Associate's
  maximum exposure to medical financial risk (premiums plus deductibles

plus co-payments) to a more manageable level, potentially 15 percent of the average income for a full-time Associate.

¶ To address concerns about access, help Associates gain access to the private insurance market after 30 days of employment and potentially provide them with limited funding for doing so while they wait to become eligible for Wal-Mart's plan.

These changes would give us a powerful set of messages to use in combating critics. (For instance, "Wal-Mart offers Associates access to health insurance after they've worked with us for just 30 days.") These kinds of changes would also make Wal-Mart's coverage more affordable and accessible, directly addressing critics' and Associates' most persistent arguments.

While this fourth bold step should create goodwill both internally and externally, it will be expensive. In FY2011, the cost of these three proposals would be between $300 million and $350 million. Considering the steep cost, as well as the potential unintended implications on underlying plan design, the team is rigorously testing these ideas with the public and policymakers to determine whether these investments would effectively "move the needle" on Wal-Mart's public reputation.

**Improve communication of our benefits offering so we get more credit for what we provide and, over the long term, work to shape the outcomes of state and national healthcare reform efforts**

We need to be more proactive in the public arena. Three efforts are needed here:

¶ Address the Medicaid issue head-on by reframing the debate (e.g., this is everyone's problem, not just Wal-Mart's) and by offering some type of counterproposal or compromise. This first effort is critical because Wal-Mart is under serious attack from state governments with regard to the number of Associates on publicly funded health insurance. These attacks show no signs of abating – in fact, they seem to be accelerating – and elected officials are proposing increasingly costly solutions.

¶ Clarify and improve messages about our healthcare offering (building on the proposed changes outlined above) and engage in a sustained communication campaign. This kind of communication will help us reframe public perception of our healthcare offering, the only way for us

to start winning the debate with our critics.  It will also help us build the credibility needed to weigh in more broadly on U.S. healthcare issues.

¶ Become more engaged in the national healthcare debate, to position Wal-Mart as a leader in healthcare in general and on access (e.g., individual mandates) and affordability (e.g., bringing IT to healthcare) in particular.  Establishing Wal-Mart as a leader on this critical issue will help deflate our critics.  It will also put us in a position to help shape the outcome of the public debate about the healthcare crisis in a way that is at least somewhat advantageous to our interests.

# 3 Impact of the Proposed Changes

Taken together the limited-risk initiatives and the bold steps create a powerful set of advantages for Wal-Mart.

**SIGNIFICANT ADVANTAGES**

The new strategy will enable us to deal with all three of the benefits-related challenges we face.

¶ **Cost control.** Benefits costs are modeled to be at or below 1.9 percent of sales (i.e., level as of FY 2005) in 2011. (The limited-risk initiatives result in a reduction in projected 2011 benefits costs of about 16 percent, and the bold steps yield another reduction of about 9 percent.)

¶ **Associate satisfaction.** Associates will have a more generous healthcare benefit with an HSA to cover first-dollar expenses, greater protection against medical risk, and the ability to accumulate wealth in their HSAs; a retirement benefit that helps them prepare more effectively for retirement, and more choice, especially with regard to selecting other benefits (e.g., paid time off). Moreover, we will be more effective at attracting and retaining the healthy, productive workforce Wal-Mart wants.

¶ **Public reputation.** By providing Associates more affordable health coverage and responding to concerns about Wal-Mart's Medicaid/S-CHIP enrollment, we will have addressed our critics' most potent arguments. We will also have stepped-up our efforts to communicate the strengths of Wal-Mart's benefits offering and counter critics' claims. Finally, we will have positioned Wal-Mart to have a "seat at the table" in the public debate about healthcare reform.

## RISKS

The risks associated with these changes are worth carefully noting.  Addressing them will require, among other things, attention to implementation planning, communication, and execution.

¶ **Cost risk.**  If costs saving initiatives are not properly sequenced with those that require investments, costs could increase before they decrease.

¶ **Associate satisfaction risk.**  Some of the proposed revisions to the benefits strategy (e.g., the move to consumer-driven health plans, the changes in the retirement program) have the potential to upset Associates, especially more tenured Associates.

¶ **Public reputation risk.**  Healthcare enrollment will fall several percentage points due primarily to a shift to more part-time Associates, which could draw additional attacks from Wal-Mart's critics.  Also, despite the proposed efforts, the Medicaid problem will not be "solved." A significant number of Associates and their children will still qualify for Medicaid.  Because many of these programs will offer more generous health insurance than Wal-Mart provides, many Associates will still choose to enroll in Medicaid, leaving the door open for continued attacks.

The team believes that the advantages of the proposed strategy outweigh these risks.

* * *

I appreciate your taking the time to engage so fully on this topic and look forward to discussions with you at the special Board meeting in November.  In the meantime, I would welcome hearing your reactions to our work to date.

**Supporting Exhibits: 7**

EXHIBIT 1

# Rising Healthcare Costs Driven Primarily by Utilization

$ Millions



| | FY 2002* | More Associates | More Dependents | Unit cost increases | National trends | Aging faster | Other factors* | FY 2005* – getting sicker faster and other factors |
|---|---|---|---|---|---|---|---|---|
| | 1411 | 167 | 63 | 176 | 270 | 86 | 92 | 2265 |
| Historical growth rate (%) | | 6.4 | 3.4 | 2.0 | 6.0 | 2.0 | 2.0 | |
| Wal-Mart contribution $ Millions | | 902 | | | | | | 1,511 |
| Wal-Mart contribution as a percent of sales | | 0.53 | | | | | | 0.66 |

Increased utilization

\* Total plan costs – associate premiums plus Wal-Mart contribution
Source: Wal-Mart Benefits Finance; Medstat; Milliman; U.S. Census



EXHIBIT 2

## Costs Rise with Tenure but Productivity Does Not

**Associate cost per hour**
Dollars

**Sales per labor hour by store**
Dollars

| | CAGR** Percent |
|---|---|
| | 7.9 |
| | 8.8 |
| | 7.6 |

* Includes Medicare, FICA, Unemployment, Stock Purchase, Discount Card, Profit Sharing/401(k), Healthcare, and PTO; healthcare cost
  based on average age of 1-year and 7-year Associates
** Compounded annual growth rate
Source:  FT / PT Economic Model; Store Database

BOD Retreat FY06: Benefits Strategy
Confidential

21

EXHIBIT 3

# Associate-Ranked Satisfaction and Importance Varies by Benefit



* 5-point scale

Source: Associate Benefits Satisfaction and Preferences Survey, June 2005, n = 3,585; Benefits Finance; FACT

EXHIBIT 4

# Wal-Mart Covers a Greater Percentage of Associates than Retailers but Less than National Employers



**Eligibility for health insurance – percentage of all Associates**

Wal-Mart* 81 | National 81 | Retail 56

**Participation in health insurance – percentage of eligible Associates**

Wal-Mart* 60 | National 83 | Retail 63

**Enrollment in health insurance – percentage of all Associates**

Wal-Mart* 48 | National 68 | Retail 36

\* Self-reported survey results

Source: Yankelovich survey (2004); Kaiser/HRET Survey of Employer-Sponsored Health Benefits 2003

EXHIBIT 5

# Significant Portion of Associates and Their Children Are Uninsured or on Government Insurance

**Associates/employees**

| | Medicaid | Uninsured |
|---|---|---|
| **Wal-Mart** | 5% | 19% |
| **National workers\*** | 4% | 18% |
| **Retail** | 6% | 18% |

**Children of Associates/employees**

| | Medicaid/ S-CHIP | Uninsured |
|---|---|---|
| **Wal-Mart** | 27% | 19% |
| **National workers\*** | 22% | 10% |
| **Retail** | 36% | N/A |

\* Data is limited to those individuals (and their children) who are in the workforce

Source:   Associate Benefits Satisfaction and Preferences Survey (2005); Yankelovich survey (2004); 2003 Current Population Survey; Bureau of Labor Statistics; Consumer Population Report 'Children With Health Insurance'; Employee Benefit Research Institute "Sources of Health Insurance and Characteristics of the Uninsured" (2004); Every Child by Two "Facts about Children's Health Insurance'



**EXHIBIT 6**

# Limited-Risk Initiatives

Ⓒ Cost control   Ⓢ Associate satisfaction   Ⓡ Public reputation

**EXHIBIT 7**

# Bold Steps

Legend: (C) Cost control   (S) Associate satisfaction   (R) Public reputation

| Step | Timing | Satisfaction evaluation |
|------|--------|-------------------------|



Satisfaction evaluation scale: Negative — Positive

**Step**

1. Move all Associates to "progressively-designed" consumer-driven health plans to help control cost trends while allowing Associates to build up savings in Health Savings Accounts
   - Timing: Medium-term
   - Scale: S (Least attractive segment) ... R S ... C (Most attractive segment)

2. Restructure the profit sharing and 401(k) program to reduce costs and help Associates better save for retirement
   - Timing: Medium-term
   - Scale: S R ... C

3. Redesign benefits and other aspects of the associate experience, such as job design, to attract a healthier, more productive workforce
   - Timing: Long-term
   - Scale: S (Least attractive segment) ... R S C (Most attractive segment)

4. Make some select strategic investments in Wal-Mart's healthcare offering (e.g., lower maximum out-of-pocket expenses) so it can better withstand external scrutiny
   - Timing: Short to medium-term
   - Scale: C ... S R

5. Improve communication of Wal-Mart's benefits offering so the company gets more credit for what it provides and, over the long-term, work to shape state and national outcomes on healthcare
   - Timing: Medium-term
   - Scale: S R ... S R

BOD Retreat FY06: Benefits Strategy
Confidential

# Exhibit 3

Page 1

1

2    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
     KATHLEEN CURNS and LINDA            )
4    ZUKAITIS,                           )
                                         )
5              Plaintiffs,               )
                                         )
6    -against-                           )
                                         ) Index No.
7                                        ) 06-CV-1336
     WAL-MART STORES, INC.,              )
8                                        )
               Defendant.                )
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
10

11

12

13

14            ***CONFIDENTIAL***

15

16       DEPOSITION OF MARGARET DANIEL
             New York, New York
17           February 26, 2008
18

19

20

21

22

23

24   Reported by:
     Judi Johnson, RPR, CLR
25   Job No.: 15230

1        CONFIDENTIAL - MARGARET DANIEL

2        Q     Do you know where your assistant would

3    obtain the script or print it off?

4        A     On the computer.

5        Q     Did you share or give a copy of the

6    interview script to any of the applicants who

7    you would later be interviewing for the fashion

8    merchandiser position in your market?

9        A     No.

10       Q     To your knowledge, is there any rule

11   that would govern the permissibility of

12   providing a copy of the interview script to

13   candidates in advance of their interview for any

14   position at Wal-Mart?

15       A     Not to my knowledge, no.

16       Q     To your knowledge, would that be

17   permissible?

18       A     It wouldn't be inappropriate.

19       Q     It's a double negative.  I'm trying to

20   work through it.

21           MR. FINGER:  She actually answered

22       your question, but used a different word.

23   BY MR. GRAFF:

24       Q     Is your testimony it would be

25   appropriate to give candidates of the scripts at

CONFIDENTIAL - MARGARET DANIEL

1   the interview before they actually go through

2   their interview?

3         MR. FINGER:  Objection.  She said, and

4   I quote, it wouldn't be inappropriate.

5   BY MR. GRAFF:

6         Q    To your knowledge, for any of the

7   fashion merchandiser positions that you may have

8   knowledge of the process, were any candidates

9   for fashion merchandiser positions given advance

10  copies of the interview script?

11        A    Not to my knowledge.

12        Q    If an interviewer were to give advance

13  copies of the interview script for a fashion

14  merchandiser position to any individual

15  candidate, would it be your understanding that

16  they would have to make the same provision for

17  all candidates they're interviewing?

18        MR. FINGER:  Objection, form.

19        You can answer it, if you can.

20        A    There is no direction one way or the

21  other on that.

22        Q    Would an interviewer be permitted to

23  give only certain candidates who that

24  interviewer would be interviewing for a fashion

25

CONFIDENTIAL - MARGARET DANIEL

1   merchandiser position copies of the scripts but

2   not all of the candidates that they would be

3   interviewing?

4        A     There is no direction on that.

5        Q     Without respect to any direction, I'm

6   asking now for your understanding of the rule.

7             MR. FINGER:  How can she have an

8        understanding of a rule when she just said

9        there's no direction?

10   BY MR. GRAFF:

11        Q     Is it your belief that it would be

12   appropriate to selectively give advanced copies

13   to certain candidates and not others for the

14   position of fashion merchandiser positions?

15             MR. FINGER:  Objection.  Asked and

16        answered.

17             You can answer it again.

18        A     There is no rule or direction on that.

19   So what I do has no bearing on that.

20        Q     Just once more to nail it down.  Is

21   there, to use your term, any rule or direction

22   with respect to whether candidates need to be

23   asked the same questions, that is, candidates

24   for the same position?

1          CONFIDENTIAL - MARGARET DANIEL

2     document, about 2 inches down from the top

3     there's a row that reads across, retention and

4     diversity total, 4.15, which accounts for

5     10.0 percent of the total evaluation score.

6          Based on your familiarity with similar

7     documents, though not identical to this, would

8     you understand that this should be interpreted

9     as stating that Linda Zukaitis received a score

10    of 4.15 on retention and diversity and that that

11    score represented 10 percent of her overall

12    score on this management performance appraisal?

13         MR. FINGER:  Objection as to the form.

14    A     That would be my understanding.

15    Q     Turning to the third page of the

16    document, about six rows down there's a shaded

17    box that says controllable expenses-jewelry.

18         Do you know what the controllable

19    expenses that are referred to here are?

20    A     Not specifically.

21    Q     Have you encountered the phrase

22    "controllable expenses" on management

23    performance appraisals that you have seen

24    before?

25    A     Yes.

CONFIDENTIAL - MARGARET DANIEL

1

2      Q      And what do controllable expenses --
3  what does that term mean, as you understand it?
4      A      There are things that you actually can
5  control at store level to a degree.
6      Q      Is there such a thing as
7  uncontrollable expenses?
8      A      Yes.
9      Q      What do uncontrollable expenses
10  include?
11      A      Things you have no control over.
12      Q      Can you give some examples of things
13  that fall under that category?
14      A      Your rent, your taxes, any type of
15  government fees, remodel expense.
16      Q      What about payroll, is that a
17  controllable expense?
18      A      Yes, it's a controllable expense.
19      Q      And does payroll include base salary?
20      A      I don't understand your question.
21      Q      Let me ask it differently.
22            Does payroll include the bonuses that
23  employees receive on an annual basis?
24      A      I don't believe so.
25      Q      Would bonuses be an uncontrollable

1                CONFIDENTIAL - MARGARET DANIEL

2      expense?

3                MR. FINGER:  Objection.

4      A      I don't know.

5      Q      What about employee benefits, do those

6      fall under the category of controllable

7      expenses?

8      A      Some do.

9      Q      Which employee benefits are classified

10     as controllable expenses?

11               MR. FINGER:  Objection as to the form.

12               You can answer it, if you know.

13     A      I really -- to clarify that, I don't

14     have a P&L in front of me, which is a profit and

15     loss statement, so I'm not absolutely 100

16     percent positive of all the categories.

17     Q      Are the categories of controllable and

18     uncontrollable expenses identified on a P&L?

19     A      Yes.

20     Q      Do you know whether Wal-Mart's

21     contribution towards employee healthcare

22     benefits would be classified as a controllable a

23     expense?

24     A      I believe it is.

25     Q      You can put aside that document.

Exhibit 4

Page 1

1

2            UNITED STATES DISTRICT COURT

3            NORTHERN DISTRICT OF NEW YORK

4     --------------------------------X

      KATHLEEN CURNS and LINDA

5     ZUKAITIS,

6                  Plaintiffs,

7           vs.                          Civil Action

                                  No. 06-CV-1336 (GLS/DRH)

8

      WAL-MART STORES, INC,

9

                   Defendant.

10    --------------------------------X

11

12       *   CONFIDENTIAL - ATTORNEYS EYES ONLY   *

13            DEPOSITION OF MICAH HAWK

14               New York, New York

15            Wednesday, March 19, 2008

16

17

18

19

20

21

22

23

24    Reported by:

      ANNETTE ARLEQUIN, CCR, RPR

25    JOB NO. 15228

1    M. Hawk - Confidential - Attorneys Eyes Only

2         A.    Maximum eligibility was 50 percent.

3         Q.    Was your salary 150 in '07 also?

4         A.    For half of the year.  I didn't --

5    first of all, we didn't reach maximum bonus for

6    this last year, so that's part of it.

7              And secondly, I was in two different

8    roles in 2007, so part of my year would be based

9    on a 35 percent bonus structure at a lower base

10   pay and part of the year would be based on a

11   $150,000 base pay and a 50 percent bonus

12   structure.

13        Q.    And when you say you didn't reach

14   maximum, is that based on individual performance

15   or some other standard?

16        A.    No.  We're paid based on a number of

17   corporate metrics or company metrics from our

18   division, the west division, to the Wal-Mart

19   stores division to the total company and they

20   have different weighting, but I couldn't tell

21   you what the weighting is.

22        Q.    Is your individual performance a

23   factor at all in determining a bonus?

24        A.    My bonus, I believe my individual

25   performance contributes to the performance of my

1    M. Hawk - Confidential - Attorneys Eyes Only

2    division and indirectly impacts my bonus

3    percent, but I'm not sure if that's what you're

4    asking.

5         Q.    Well, what's the -- how is the

6    performance of your division or unit measured?

7         A.    Sales, profit and inventory turns.

8         Q.    And it's all based on numbers out of

9    the stores in your division?

10        A.    Yes, that component of our bonus is

11   based out of the stores in our division.

12        Q.    And what are the other components of

13   your bonus?

14        A.    Wal-Mart stores, overall Wal-Mart

15   stores division, should be the -- so we've got

16   the west division of Wal-Mart stores and we have

17   total U.S. Wal-Mart stores, and then we have

18   total company, which is all inclusive.

19        Q.    And it's all based on the

20   profitability or the sales, profit and

21   inventory?

22        A.    Yes, the total store's portion is

23   then based on the total company performance,

24   sales, profit and inventory turns versus plan.

25              The company goal is one that I can't

Exhibit 5



# Thompson Wigdor & Gilly LLP ATTORNEYS AND COUNSELORS AT LAW

Empire State Building
350 Fifth Avenue
Suite 5720
New York, NY 10118
Tel 212.239.9292
Fax 212.239.9001
www.twglawyers.com

**Ariel Y. Graff**
agraff@twglawyers.com

August 2, 2007

## BY OVERNIGHT MAIL DELIVERY

Marguerite Wynne, Esq.
Thelen Reid Brown Raysman & Steiner LLP
900 Third Avenue
New York, NY 10022

      Re:   <u>Curns and Zukaitis v. Wal-Mart Stores, Inc., 06-CV-1336 (GLS/DLH)</u>

Dear Marguerite:

Enclosed please find authorizations for the release of Plaintiffs' medical records covering the agreed-upon period from January 1, 2003 to the present.  We trust that you will provide our office with copies of any medical records that you obtain from Plaintiffs' healthcare providers.

Sincerely,

Ari Graff

Enclosures



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Kathleen E. Curns | ███████ | ████████ |

| Patient Address |
|---|
| ██████████ Summit, NY 12175 ██████ |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL ARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

. . Name and address of health provider or entity to release this information:
**Dr. Richards, ███████████, Schenectady, NY 12305,** ▣

8. Name and address of person(s) or category of person to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
☑ Medical Record from (insert date) <u>**01/01/03**</u>_____ to (insert date) <u>**Present**</u>
☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: _____

_____

Include: (*Indicate by Initialing*)

*KC* **Alcohol/Drug Treatment**
*KC* **Mental Health Information**
*KC* **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
               Initials                      Name of individual health care provider
  to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | **Conclusion of Litigation** |

| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |
|---|---|
| | |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of them.

*Kathleen C Curns*_____     Date: *7-04-07*_____
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.**



OCA Official Form No.: 960

# AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA
## [This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| **Kathleen E. Curns** | ███████ | ███████ |

| Patient Address |
|---|
| ██████████████ **Summit, NY 12175** |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL** and **DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL ARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

| 7. Name and address of health provider or entity to release this information: |
|---|
| **Michael Krajick,** ███████ **Cobleskill, NY 12043,** ███████ |

8. Name and address of person(s) or category of persons to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
☑ Medical Record from (insert date) **01/01/03** to (insert date) **Present**
☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
☐ Other: _____

_____

Include: (*Indicate by Initialing*)
*KC*  **Alcohol/Drug Treatment**
*KC*  **Mental Health Information**
*KC*  **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
          Initials                          Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | **Conclusion of Litigation** |
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

*Kathleen C Curns*          Date: *7-04-07*
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.**



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name<br>**Kathleen E. Curns** | Date of Birth<br>███████ | Social Security Number<br>████████ |
|---|---|---|

| Patient Address<br>███████████ **Summit, NY 12175** | | |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:
In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
**Kimberlee Culver,** ███████████ **Schoharie, NY 12157,** █████████                                   ⊞

8. Name and address of person(s) or category of person to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
   ☑ Medical Record from (insert date) **01/01/03** _____ to (insert date) **Present** _____
   ☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
   ☐ Other: _____
   _____

Include: (*Indicate by Initialing*)
   _KC_ Alcohol/Drug Treatment
   _KC_ Mental Health Information
   _KC_ HIV-Related Information

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
       Initials                                   Name of individual health care provider
   to discuss my health information with my attorney, or a governmental agency, listed here:

   _____
   (Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:<br>☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | 11. Date or event on which this authorization will expire:<br><br>**Conclusion of Litigation** |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

*Kathleen Curns*                                        Date: **7-04-07**
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.**



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
**[This form has been approved by the New York State Department of Health]**

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Kathleen E. Curns | ███████ | ███████ |

| Patient Address |
|---|
| ███████████████ **Summit, NY 12175** |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL** and **DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

. . Name and address of health provider or entity to release this information:
**Bassett Hospital of Schoharie County,** ███████████ **Cobleskill, NY 12043,** ███████████

8. Name and address of person(s) or category of person to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
☐ Medical Record from (insert date) _____ to (insert date) _____
☑ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
☐ Other: _____

_____                    Include: (*Indicate by Initialing*)

_KC_ **Alcohol/Drug Treatment**

_KC_ **Mental Health Information**

**Authorization to Discuss Health Information**          _KC_ **HIV-Related Information**

(b) ☐ By initialing here _____ I authorize _____
        Initials                                                    Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: <br> ☐ At request of individual <br> ☑ Other: **Lawsuit against Employer** | 11. Date or event on which this authorization will expire: <br><br> **Conclusion of Litigation** |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of them.

*Kathleen E Curns*                                Date: 7-4-07
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Kathleen E. Curns | ▮▮▮▮▮ | ▮▮▮▮▮ |

| Patient Address |
|---|
| ▮▮▮▮▮▮▮▮▮ Summit, NY 12175 |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
Rebecca Eckel,                    Cobleskill, NY 12043, ▮

8. Name and address of person(s) or category of person to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
☑ Medical Record from (insert date) **01/01/03** _____ to (insert date) **Present** _____
☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
☐ Other: _____

Include: (*Indicate by Initialing*)
_KC_ **Alcohol/Drug Treatment**
_KC_ **Mental Health Information**
_KC_ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
       Initials                              Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here: _____

(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | **Conclusion of Litigation** |
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

*Kathleen E Curns*                    Date: 7-04-07
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS.** The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

# AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA
## [This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| **Kathleen E. Curns** | ██████████ | ██████████ |

| Patient Address |
|---|
| ████████████████ **Summit, NY 12175** |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL ARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

. . Name and address of health provider or entity to release this information:
    **Peter O. Garner,** ████████████ **Cobleskill, NY 12043,** ████████████

8. Name and address of person(s) or category of person to whom this information will be sent:
    **Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
   ☑ Medical Record from (insert date) **01/01/03** _____ to (insert date) **Present**
   ☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
   ☐ Other: _____

   Include: (*Indicate by Initialing*)
   *KC* Alcohol/Drug Treatment
   *KC* Mental Health Information
   *KC* HIV-Related Information

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
       Initials                                    Name of individual health care provider
   to discuss my health information with my attorney, or a governmental agency, listed here:

   _____
   (Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: <br> ☐ At request of individual <br> ☑ Other: **Lawsuit against Employer** | 11. Date or event on which this authorization will expire: <br><br> **Conclusion of Litigation** |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

*Kathleen O' Curns*                     Date: **7-04-07**
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Linda L. Zukaitis | ████████ | ████████ |

| Patient Address |
|---|
| ████████ Canandaigua, NY 14424 |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
**Dr. Patrick McGrath,** ████████ **Spencerport, NY 14559**

8. Name and address of person(s) or category of person to whom this information will be sent:
**Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022**

9(a). Specific information to be released:
☑ Medical Record from (insert date) **01/01/03** to (insert date) **Present**
☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
☐ Other: _____

Include; (*Indicate by Initialing*)
_____ **Alcohol/Drug Treatment**
_____ **Mental Health Information**
_____ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _____ I authorize _____
Initials                         Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:<br>☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | 11. Date or event on which this authorization will expire:<br>**Conclusion of Litigation** |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_Linda L Zukaitis_                         Date: **7-5-07**
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Linda L. Zukaitis | ▮▮▮▮▮ | ▮▮▮▮▮ |

| Patient Address |
|---|
| ▮▮▮▮▮ Canandaigua, NY 14424 |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL ARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

| 7. Name and address of health provider or entity to release this information: |
|---|
| Wendy Cody, RPA, ▮▮▮▮▮ Spencerport, NY 14559 |

| 8. Name and address of person(s) or category of person to whom this information will be sent: |
|---|
| Joel L. Finger, Esq., Thelen Reid, LLP, 900 Third Ave., New York, NY 10022 |

9(a). Specific information to be released:
- ☑ Medical Record from (insert date) **01/01/03** _____ to (insert date) **Present** _____
- ☐ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
- ☐ Other: _____

_____                     Include: (*Indicate by Initialing*)

_____                     _/LZ/_ **Alcohol/Drug Treatment**

**Authorization to Discuss Health Information**              _/LZ/_ **Mental Health Information**

                                                             _/LZ/_ **HIV-Related Information**

(b) ☐ By initialing here _____ I authorize _____
         Initials                              Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____

(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☐ At request of individual<br>☑ Other: **Lawsuit against Employer** | **Conclusion of Litigation** |
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_Linda L. Zukaitis_                     Date: _7-5-07_
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.

Exhibit 6

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

------------------------------x

KATHLEEN CURNS and

LINDA ZUKAITIS,

                Plaintiffs,

          vs.           Civil Action No.

                1:06-CV-1336(GLS)(DLH)

WAL-MART STORES, INC.,

                Defendant.

------------------------------x

DEPOSITION OF KATHLEEN CURNS

New York, New York

October 24, 2007

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 13647

Page 118

CURNS

1
2  qualified for the position, and I asked her at
3  that time if it had anything to do with my age,
4  and she said let's not go there.  And that was
5  the end of my conversation.
6        Oh, no, I am sorry, I do have
7  something else to say.  She told me that people
8  were sending recommendations -- not to take this
9  personal, and people from the home office,
10 divisionals, who I have worked under, were
11 sending recommendations to Don Quinn to apply
12 for his position.  Oh, and I told her, I am
13 sorry, I am running rampant here, just a minute.
14 That John Morgans had the questions to the
15 interview.  And she said that how do I know
16 that?  And I said because John Morgans told me
17 himself that he had the questions to the
18 interview, and she said well, that's illegal.  I
19 said well, he had the questions.
20        So she said people were sending
21 recommendations to Don Quinn, because you're
22 applying for the fashion merchandiser in his
23 area, so I said yes.  So she said, she said to
24 me do you want me to print up the interview?  I
25 said no.  Why would I want to you do that when

1                        CURNS
2    you just told me that was illegal.
3             And that was the end of my
4    conversation with Stacy.
5        Q.    Is there anything else about the
6    conversation with Stacy that you remember?
7        A.    Just at the end when I said is this
8    a -- is this because of my age, and she said
9    let's not go there.  That was it.
10       Q.    What did you understand her to mean by
11   that?
12       A.    I just understand that we don't talk
13   about that here.  That's what I understood it
14   for.
15       Q.    When did John Morgans tell you that he
16   had the questions for the interview?
17       A.    The day of the interview.
18       Q.    I am sorry?
19       A.    The day of his interview.  He called
20   me and told me he was getting interviewed from
21   Stacy, and that he said that he had the
22   questions, he was going over the questions, and
23   I asked him what questions.  I said I didn't
24   even know -- he said yes, they have questions,
25   what they are going to ask, and I said wow,

9a9bb845-e9ca-494b-a318-caafcb41346f